UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE

| | |
|---|---|
| OGGUSA, INC., *et al*[1] | CASE NO. 20-50133 |
| DEBTORS | JOINTLY ADMINISTERED |

| | |
|---|---|
| OGGUSA, INC., *fka GenCanna Global USA, Inc.* | PLAINTIFF |
| V. | ADV. NO. 20-5032 |
| LOUISVILLE DRYER COMPANY | DEFENDANT |

**MEMORANDUM OPINION**

Plaintiff OGGUSA, Inc., fka GenCanna Global USA, Inc. ("GenCanna"), filed a Complaint against Defendant Louisville Dryer Company ("LDC"), contending that LDC breached the parties' agreement relating to LDC's manufacture of equipment for GenCanna's use at its Mayfield production facility. LDC insists GenCanna breached the agreement and filed a proof of claim in GenCanna's bankruptcy case for damages. At the trial held on February 22, 2022, GenCanna failed to prove that LDC breached the parties' agreement and LDC failed to justify allowance of its claim.

**I.    Facts.**[2]

GenCanna and its co-debtors comprised a vertically integrated agriculture-technology company primarily engaged in the development of hemp genetics and the production and distribution of cannabinoid products. As a component of their business, GenCanna and the

---

[1] The Debtors in these Chapter 11 cases are OGGUSA, Inc., OGG, Inc., and Hemp Kentucky, LLC.

[2] Nearly all facts described in this Opinion stem from the parties' pretrial stipulations. [ECF No. 133.] Facts generated from trial testimony are separately identified.

other debtors processed hemp plants into products containing hemp-derived substances including legal, non-intoxicating cannabidiol ("CBD").

LDC manufactures equipment, including massive rotary dryers and coolers used to process hemp. Dan Claycamp, GenCanna's former vice president of operations, confirmed that each dryer is approximately the size of a school bus, with the coolers only slightly smaller. [ECF No. 129-41[3] at 17; *see also* ECF No. 124-74 (scale drawings of dryer and cooler).]

The parties began exchanging information for the manufacture and sale of dryers and coolers in late 2018. The discussions and proposals ultimately resulted in a written contract for four dryers and two coolers. The equipment was slated for installation and use in GenCanna's new hemp production facility under construction in Mayfield, Kentucky (the "Mayfield Facility").

    **A.**    **LDC and GenCanna agree to manufacture and purchase dryers and coolers.**

In December 2018, LDC provided two initial proposals to GenCanna for the manufacture and supply of equipment: a proposal for three rotary steam tube dryers at the price of $4,074,135 and a proposal for one counter-current rotary air cooler for $275,366. On January 2, 2019, GenCanna paid LDC $1,300,000, just under 30% of the purchase price for the quoted equipment.

On January 15, 2019, GenCanna paid LDC $490,023 for two unrelated projects. After those projects were canceled, the parties agreed to apply GenCanna's second payment to the purchase price of the dryers and coolers, resulting in a total payment by GenCanna of $1,790,023.

On February 21, 2019, LDC sent GenCanna a second proposal for four dryers, and the next day it sent a revised proposal for two coolers (the "Proposals"). The Proposals provided:

---

[3] The parties used Mr. Claycamp's deposition transcript as his trial testimony because he was unavailable.

"The equipment offered in this proposal is quoted FCA from point of origin, loaded on customer-supplied transport; all permits, taxes, installation, and freight are the responsibility of the purchaser." [ECF No. 129-3 at 5; ECF No. 129-4 at 3.] FCA means "free carrier," which is a business term that defines the seller's limited obligation to ship goods. The parties agreed that the FCA obligation is interpreted using the Incoterms created by the International Chamber of Commerce. [*See* ECF No. 129-34.]

LDC's General Manager, Trey Mathis, explained at the trial that the Proposals and Incoterms obligated LDC, as the manufacturer/seller, to load the equipment at the LDC facility. Once loaded, the equipment is deemed delivered.

The Incoterms set out other pertinent provisos related to the equipment's delivery from LDC to GenCanna. The Incoterms obligated GenCanna to "contract at its own expense for the carriage of the goods from the named place of delivery" and delivery was to occur "at the named place on the agreed date or within the agreed period." [*Id*. at 2.] GenCanna agreed to "take delivery of the goods when they have been delivered as envisaged…." [*Id*. at 3.] LDC would "give [GenCanna] sufficient notice either that the goods have been delivered in accordance with [the Incoterms] or that the carrier or another person nominated by [GenCanna] has failed to take the goods within the time agreed." [*Id*. at 4.] GenCanna was further obligated to notify LDC of "the name of the carrier … within sufficient time as to enable [LDC] to deliver the goods" and, "where necessary, the selected time within the period agreed for delivery when the carrier … will take the goods[.]" [*Id*.]

The Proposals also set forth "REQUIREMENTS TO BE PROVIDED BY THE BUYER NOT INCLUDED IN THIS PROPOSAL" that included "[a]ll freight from the point of origin[,]" "[a]ll labor, materials and associated equipment required for installation and start-up[,]" "[h]eavy

3

lift equipment and cranes[,]" and "[s]ite preparation, foundation design, footings, anchor bolts and/or necessary blocking to provide support for equipment." [ECF No. 129-3 at 5; ECF No. 129-4 at 4.]

Another pertinent term in the Proposals was LDC's standard project payment terms:

30% project initiation payment, due net[,]
30% upon receipt of shell plate, due net 10 days,
30% upon completion of shell less internals, due net 10 days[, and]
10% upon readiness to ship, due net.

[ECF No. 129-3 at 4; ECF No. 129-4 at 3.]

On April 4 and 5, 2019, the parties' representatives exchanged writings confirming their assent to the Proposals' terms. [ECF No. 124-25; ECF No. 129-7; *see also infra* at Part I.B.] The price of the four dryers was $5,432,180 and the price of the two coolers was $603,674, for a total price of $6,035,854.

### B.    GenCanna obtains third-party financing for certain equipment and the parties execute the Agreement.

LDC began work on the dryers and coolers in early 2019. By mid-March, it requested the progress payment required by the Proposals or it would stop work on the project. GenCanna did not pay, so LDC declared a default and halted production on March 21, 2019.

GenCanna searched for third-party financing and eventually agreed to a sale leaseback arrangement with SQN Asset Income Fund V, L.P. a/k/a Arboretum Group, LLC ("SQN," a non-party to this proceeding). LDC, GenCanna, and SQN entered into the Ratification and Partial Assignment dated May 31, 2019. [ECF No. 129-14 (the "Agreement").] The Agreement incorporated the Proposals and their progress payment terms and assigned GenCanna's rights under the Proposals for three dryers and one cooler to SQN (the "Assigned Equipment"). SQN

delivered $3,600,000 to LDC, representing full payment for the Assigned Equipment (the "SQN Payment").[4]

At trial, LDC and GenCanna referred to SQN as a sale-leaseback financier. Richard Drennen, GenCanna's former Chief Operating Officer and Director of Administration, explained that GenCanna sought to finance long term assets over time to enhance cash flow. GenCanna would have financed a higher proportion of the total price of the dryers and coolers, but SQN would not go higher.

The Agreement revised the delivery dates to provide: "Seller can have the first two (2) dryers … ready for load-out on Tuesday, October 1, 2019; the third dryer ... may be ready for load-out on Wednesday, October 9, 2019." [*Id*. at 2.] In addition, the Agreement provided that the revised delivery date for the fourth dryer "will be determined after delivery of" the first three dryers. [*Id*.] The parties never set an expected delivery date for the coolers. The testimony offered at trial reflected the parties' mutual understanding that LDC would manufacture the first cooler at the same time as the first three dryers. The parties would coordinate completion and delivery of the fourth dryer and second cooler after delivery of the Assigned Equipment.

The Agreement did not modify GenCanna's obligation under the Incoterms to arrange and pay for transfer of the equipment from LDC's manufacturing facility to GenCanna's Mayfield Facility. The Agreement also did not affect GenCanna's responsibility to prepare the Mayfield Facility for the arrival and installation of the equipment via the design and construction of a reinforced foundation and piers. Further, nothing in the Agreement obligated SQN to take

---

[4] The Agreement referenced the correspondence between Plaintiff and Defendant for the four dryers and two coolers at a total price of $6,035,854 and specifically provided that the terms of the Proposals "remain[] in full force and effect except as are specifically modified as hereinafter set forth[.]" [ECF No. 129-14 at recitals.] The Agreement also stated "[i]n the event of a conflict between" the terms and conditions of the two contracts, "the terms and conditions of the [Proposals] shall govern, supersede, and prevail [over the terms of the Agreement]." [*Id*. ¶ 5.]

on any obligation for delivery or possession of the equipment; it was merely the financier in a sale leaseback transaction.

LDC applied the SQN Payment to the full purchase price of all the equipment, resulting in a $645,831 balance owed to LDC for the four dryers and two coolers. Neither party offered testimony addressing allocation of the SQN Payment to the four dryers and two coolers. On June 5, 2019, GenCanna emailed LDC and asked for a date "to check on the dryer progress next week and finalize a path forward with equipment deliveries?" [ECF No. 129-15 at 2.] GenCanna visited LDC's facility in Louisville to inspect the equipment on June 26, 2019, and did not visit LDC's facility again thereafter.

### C. LDC learned that GenCanna was experiencing financial problems in the summer and fall of 2019.

As 2019 progressed, GenCanna experienced financial difficulties due mostly to a precipitous drop in the market price of CBD. Drennen explained at trial that GenCanna failed in its efforts to raise additional equity. Alan Calderon, GenCanna's Vice President of Finance at that time, testified that GenCanna obtained financing from a new lender in June 2019 that put GenCanna under onerous financial constraints. By late summer, GenCanna lacked the available funds to pay hemp suppliers and the contractors, subcontractors, and material suppliers working at the Mayfield Facility. GenCanna's former General Counsel, Gary Broadbent, testified that GenCanna was attempting to conserve cash in this time frame by prioritizing payments to its employees and certain creditors.

The contractors and suppliers at the Mayfield Facility stopped negotiating payment terms and began filing mechanic's liens starting in early September 2019. A foreclosure complaint lists over 20 mechanic's liens recorded by the November 19, 2019, filing date. [ECF No. 124-49.] On September 3, 2019, GenCanna issued a notice that it would cease work on the

Mayfield Facility for four months. [ECF No. 129-17.] Drennen explained that GenCanna lacked the capital to both complete the construction project and pay farmers for harvested hemp. It was more important to obtain the hemp and generate sales to support the business. Broadbent recounted that a significant portion of his job responsibilities since his hiring in June 2019 involved managing payment defaults.

Mathis testified that he and other LDC personnel were aware of GenCanna's troubles in the summer and fall of 2019, and they feared GenCanna could not pay for the balance owed on the dryers and coolers. Nevertheless, LDC completed work on the Assigned Equipment and had the three dryers (along with one cooler) ready for load-out at LDC's manufacturing facility by early October 2019 as the Agreement required.

But the Mayfield Facility was not ready to receive the Assigned Equipment. The appropriate reinforced footings sufficient to support such massive pieces of equipment, which required planning by a qualified civil engineer, were not yet constructed at the Mayfield Facility. So GenCanna did not arrange for delivery of the Assigned Equipment. As a result, the Assigned Equipment, each piece roughly the size of school bus, continued to take up space on LDC's manufacturing floor and impeded its ability to construct equipment for other customers.

On November 7, 2019, GenCanna's existing hemp processing facility in Winchester, Kentucky, was destroyed by fire. The fire stopped all hemp production, a result Drennen described as devastating.

### D. Attempts to work out an arrangement continued in October, November, and December 2019.

Much of the trial testimony concerned the import of communications between the parties in the months leading to GenCanna's January 2020 bankruptcy proceeding. The first significant

exchange of correspondence occurred on October 16, 2019, when LDC's president, Mike Mercer, sent an email to GenCanna executives Drennan and Claycamp that stated:

> GenCanna remains in default under its contract with Louisville Dryer Company. To mitigate the damages caused by GenCanna's continuing default, Louisville Dryer Company will, in a private sale, begin immediately to attempt to resell the remaining dryer.
>
> Please respond immediately if you have any objection to this action or wish to discuss the viability of a cure period.

[ECF No. 124-37 (the "October 16 Email").]   Eleven minutes later, Drennen responded (copying Broadbent):

> Looping in our General Counsel under the circumstances but please know that we are close to a financing that should close on or before the end of the month, at which time we intend to pay the balance of the dryer.

[ECF No. 124-38.]   At trial, Broadbent testified that he viewed the October 16 Email as an invitation to discuss matters relating to the equipment with LDC.   Drennen testified that, if he were in LDC's shoes at that time, he would have done whatever he could to protect its interests.

At the time of this exchange, LDC had received all but $645,831 on the full price of all the equipment, which was approximately 10% of the total contract price.   The project payment scheduled provided that the final 10% payment was not due until the equipment was completed and ready for "load-out"; it was not.   LDC had purchased and received parts for the fourth dryer and second cooler, and only performed some construction work.   The parties had not even set a delivery date for that equipment.

On November 4, 2019, LDC's Mathis sent an email message to an SQN representative and to GenCanna's Drennen, asking, "Would you please advise when the (3) dryers and (1) cooler will be picked up by your freight carrier?"   [ECF No. 129-22.]   SQN's representative responded to the message the following day, copying Drennen:

8

>We will need to touch base with GenCanna again to see how preparations are coming along in order to accept delivery – when we spoke last week, the concrete foundation pads for the dryers needed to be poured and would require 7 days to set. Once those are finished, I believe they will be ready for delivery.
>
>I will reach out to GenCanna for updates and get back to you later this week.

[ECF No. 124-41.]

Mathis sent a follow-up message to GenCanna and SQN representatives on November 8, 2019, asking them to "please let us know your schedule[.]"  [ECF No. 124-47.]  Discussions regarding delivery continued in November 2019, but no date was set and no freight arrangements were made.  The conversations also included a request by SQN to determine if LDC had an interested buyer if things did not work out.  [ECF Nos. 129-23, 129-24.]

Several weeks later, on December 3, 2019, LDC's Mathis sent a letter to GenCanna's Broadbent regarding the fourth dryer and second cooler (referred to in the letter as the "Collateral").  [ECF No. 129-25 (the "December 3 Letter").]  The letter offered to waive the remaining amount due in exchange for release of any claim to the work-in-progress on the final dryer and cooler.  [*Id.*]

A "Consent and Full Release" paragraph followed the body of the letter acknowledging the debt, the payment default, and surrender of any interest in the work-in-progress.  [*Id.*]  The consent was drafted for Broadbent's signature, but he did not act on the walk-away proposal. And the Assigned Equipment remained in LDC's manufacturing facility.

### E.     GenCanna enters bankruptcy.

On January 24, 2020, three creditors filed an involuntary chapter 11 petition to put GenCanna into bankruptcy.  On February 6, 2020, GenCanna consented to the bankruptcy and filed voluntary petitions for its related entities.

GenCanna's operations continued in other locations, but the Mayfield Facility never reached a point where it was set up for installation of the dryers and coolers. GenCanna rejected the lease for the Mayfield Facility property effective May 29, 2020.

GenCanna determined post-petition that it did not need the remaining dryer and cooler. GenCanna rejected its executory contracts with LDC and demanded the return of the $1,790,023 GenCanna had paid LDC in January 2019. LDC refused the demand. On June 20, 2020, LDC filed a Proof of Claim for the balance due for the dryers and coolers, although it was unintentionally off by $800 ($645,031). GenCanna commenced this adversary proceeding against LDC on September 17, 2020.

As of June 2020, the Assigned Equipment was housed at LDC's business, taking up significant space and impairing work on other equipment for paying customers. LDC thus sued SQN in Kentucky state court and reached a settlement that included removal of the Assigned Equipment at SQN's cost in October 2020.

## II.    Jurisdiction.

The Court has jurisdiction over this adversary proceeding. 28 U.S.C. § 1334(b). It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), and (O). The parties consented to the entry of a final order and judgment. [ECF Nos. 1, 5.]

## III.   Discussion.

### A.    Count II of the Complaint was dismissed and GenCanna did not argue it was entitled to relief under Count III at trial.

Prior to trial, Count II of the Complaint for unjust enrichment was dismissed. [ECF No. 53.]

Count III is a request for turnover of the January payments totaling $1,790,023 pursuant to 11 U.S.C. § 542. GenCanna did not discuss Count III in its trial brief or pursue it at trial.

GenCanna's abandonment of, or failure to prosecute, this claim entitles LDC to judgment on Count III. FED. R. BANKR. P. 7041(b); *see also Qui v. Zhou (In re Zhou)*, 331 B.R. 274, 275 (Bankr. E.D. Mich. 2005) (deeming claims pleaded in adversary complaint abandoned when not asserted in joint final pretrial order or pursued at trial).

Even if GenCanna had pursued Count III at trial, seeking relief under § 542 is not appropriate when the debt stems from a contractual dispute. *See*, *e.g.*, *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes[.]"); *Mazel v. Lovelace Health Sys. (In re Infinity Home Health Care, LLC)*, No. 16-10062-j7, Adv. Pro. No. 18-1051-j, 2018 WL 5310659, at *2 (Bankr. D.N.M. Oct. 25, 2018) (holding a party cannot liquidate breach of contract or unjust enrichment claims through a turnover action; a turnover action "applies to a debt [only] when the debt is undisputed and presently payable"); *In re Asousa P'ship*, 264 B.R. 376, 384 (Bankr. E.D. Pa. 2001) (stating the remedy under § 542(b) "cannot be used to determine the rights of parties in legitimate contract disputes").

GenCanna also did not provide any law in its trial brief to address whether or when LDC earned the January payments demanded in the Complaint or otherwise deal with this issue at trial. LDC's standard payment terms in the Proposals required a 30% "project initiation payment," which is approximately the amount of the January 2019 payments. The Agreement referred to these payments as GenCanna's "initial down payment," and also referred to "work stoppages made by [LDC] pending resolution of interim payment milestones by" GenCanna. [ECF No. 129-14 at 1, 2.] Mathis testified that LDC used the project initiation payment to procure the materials needed to construct the dryers and coolers, and LDC in fact manufactured three dryers and one cooler for delivery.

11

GenCanna offers no reason to believe the $1,790,023 was not akin to a progress payment earned by a contractor for performance under a construction contract. *See American States Ins. Co. v. Glover Const. Co., Inc. (In re Glover Const. Co., Inc.)*, 30 B.R. 873, 875 (Bankr. W.D. Ky. 1983) (explaining "[p]rogress payments are those funds which the owner contracts to pay periodically based upon satisfactory performance [– the] compensation enables the contractor to embark on costly and lengthy projects without himself financing the enterprise[,]" and discussing contractor earning a legal and enforceable right to progress payments through performance).

### B. GenCanna did not meet its burden of proof on Count I of the Complaint.

GenCanna proceeded to trial on Count I, breach of contract, and Count IV, dismissal of LDC's proof of claim pursuant to 11 U.S.C. § 502.

"To prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson County Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). The parties agree they had a contract for specially manufactured goods and related services that is evidenced by the Agreement and the incorporated Proposals. They also agree Kentucky's version of the Uniform Commercial Code applies. *See* KY. REV. STAT. §§ 355.2-102, 355.2-105(1), 355.2-106(1).[5]

GenCanna contends that LDC anticipatorily repudiated (and thus breached) the Agreement under K.R.S. § 355.2-610 by sending the October 16 Email and December 3 Letter, entitling GenCanna to damages under K.R.S. § 355.2-711.[6] However, neither communication

---

[5] *See also Laurel Grocery Co., LLC v. Freshway, Inc.*, No. 6:18-CV-243-REW, 2019 U.S. Dist. LEXIS 222379, at *6-7 (E.D. Ky. Dec. 30, 2019) ("In Kentucky, the sales article of the UCC applies to 'transactions in goods' [including] 'mixed contracts for goods and services where the predominant factor is the sale of goods.'" (citations omitted)).

[6] Before the presentation of evidence at the trial began, LDC objected to GenCanna's right to proceed based on the theory of prepetition anticipatory repudiation by LDC. LDC argued that GenCanna's Complaint alleged that LDC

12

constituted an anticipatory repudiation of the Agreement. Accordingly, GenCanna did not establish an essential element of its claim.

### 1. The October 16 Email did not constitute an anticipatory repudiation of the Agreement.

GenCanna primarily focuses on LDC's October 16 Email that began by declaring GenCanna in "default under its contract with" LDC. [ECF No. 124-37.] The correspondence does not describe the alleged default. At trial, LDC explained the need to get the completed dryers out of the facility because they were the size of a bus and taking space needed to work on equipment for other buyers. But LDC focused its arguments on its concern over the payments due for the final dryer and cooler. [*Id.* (referring to "the remaining dryer" and not the Assigned Equipment).] Also, GenCanna established at trial that LDC was not owed a progress payment for the remaining dryer and cooler under the Proposals as of October 16, 2019.[7]

GenCanna did not, however, prove that the October 16 Email constituted an anticipatory repudiation under Kentucky law because it did not communicate an unequivocal and clear determination by LDC to cease performance under the Agreement. LDC expressly asked GenCanna to respond if it had "any objection" to the proposed private sale or "wish[ed] to discuss the viability of a cure period." [*Id.*]

The Kentucky Court of Appeals explained:

---

breached the Agreement *post-petition* when it neither completed and delivered the fourth dryer and second cooler nor returned GenCanna's payments upon demand. [ECF No. 1 at ¶¶ 42-47.] The Court overruled LDC's objection because LDC never raised it until the morning of trial – including in connection with the parties' three summary judgment motions on the breach of contract claim – and LDC suffered no surprise or undue prejudice because GenCanna's legal theory changed as the case progressed. GenCanna thus was allowed to amend its pleading to conform to the evidence. *See* FED. R. BANKR. P. 7015, *incorporating* FED. R. CIV. P. 15(b)(1).

[7] The payments GenCanna and SQN already made were more than enough to pay off the Assigned Equipment. The remaining portion of those payments would cover the first two progress payments (60%) on the final dryer and cooler, leaving less than $20,000 to apply to the final two progress payments (completion of the shell, 30%, and the amount due on shipping, 10%). The written record suggests the final dryer was at this stage, or maybe farther along. The final cooler was probably not completed to this stage. But the evidence does not clearly describe the extent of progress on the final dryer and cooler to allow allocation of the amounts paid.

> The Official Comment to [K.R.S. 355.2-610] states that "anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance. U.C.C. § 2-610 (1958). Official Comment 1. The words or facts alleged to constitute the repudiation must be "unequivocal." *Brownsboro Road Restaurant, Inc. v. Jerrico, Inc.*, 674 S.W.2d 40 (Ky. [Ct.] App. 1984).

*Upton v. Ginn*, 231 S.W.3d 788, 791 (Ky. Ct. App. 2007); *see also Automated Cutting Techs., Inc. v. BJS N. Am. E*, No. 5:10-CV-208-REW, 2012 U.S. Dist. LEXIS 96745, at *34-35 (E.D. Ky. July 12, 2012) (citing *Upton* and *Brownsboro Road Restaurant*).

The record also confirms GenCanna did not treat the email as a repudiation of future performance by LDC. GenCanna's Drennen responded almost immediately to assure LDC that GenCanna was pursuing additional financing and intended to satisfy its payment obligation. [ECF No. 124-38.] Broadbent did not testify that he viewed the October 16 Email as a termination; he understood the October 16 Email as a request to discuss issues involving the final dryer and cooler.

LDC characterized the October 16 Email as an inartfully worded demand for adequate assurance in accordance with K.R.S. § 355.2-609. LDC convincingly established at trial that it had reasonable grounds for insecurity as of October 16, 2019.

By September, many unpaid contractors, subcontractors, and materialmen filed liens against the Mayfield Facility. In early September, GenCanna paused construction on the Mayfield Facility through the end of the year without completing the foundations necessary to accept delivery of the Assigned Equipment. Then, GenCanna refused to discuss delivery of the three dryers after notice they were ready by the dates required in the Agreement.[8] Any

---

[8] GenCanna suggested that SQN assumed responsibility to take delivery of the Assigned Equipment via the Agreement, but this is illogical. SQN was merely a financer in a sale-leaseback transaction and did not expressly or by implication accept the obligation to receive the huge pieces of equipment that were only useable by GenCanna. GenCanna's argument also is inconsistent with Kentucky's Uniform Commercial Code:

14

manufacturer would have a reason to feel insecure regarding future payments and demand some form of adequate assurance in accordance with K.R.S. § 355.2-609.

But Mathis's trial testimony and the text did not show the October 16 Email was a request for adequate assurance. "To invoke UCC Section 2-609, a party's written communication must 'mention 2-609 of the code or demand assurances.' The demand for assurances must be 'a clear demand so that all parties are aware that, absent assurances, the demanding party will withhold performance.'" *Koursa, Inc. v. Manroland, Inc.*, 971 F. Supp. 2d 765, 792 (N.D. Ill. 2013) (citations omitted)); *see also Duddy v. Kitchen and Bath Distribs., Inc. (In re H.J. Scheirich Co.)*, 982 F.2d 945, 951 (6th Cir. 1993) (stating that, to invoke K.R.S. § 355.2-609, the seller must make a written demand for assurances).

The October 16 Email does not state that LDC had "reasonable grounds for insecurity" regarding GenCanna's future performance, does not invoke the applicable statute, and does not include a clear demand for assurances from GenCanna. Ultimately, the October 16 Email has no legal significance. Mathis's trial testimony revealed that LDC simply wanted to open a line of communication to understand how GenCanna intended to proceed under the Agreement given its financial circumstances.

Drennan's response and the testimony from Drennan and Broadbent confirmed GenCanna interpreted the October 16 Email similarly. They did not believe the email repudiated the Agreement and neither party changed its position based on the October 16 Email.

---

An assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of rights and unless the language or the circumstances (*as in an assignment for security*) indicate the contrary, it is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by him to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract."

KY. REV. STAT. § 355.2-210(5) (emphasis added).

### 2. The December 3 Letter did not repudiate the Agreement.

GenCanna also contends that the December 3 Letter constituted an anticipatory repudiation of the Agreement because LDC claimed GenCanna was "in default" for failure to pay the $645,831 balance due. The preceding discussion confirmed no progress payment was due. The failure to accept delivery of the three dryers in early October likely was a default, but that was not mentioned in the settlement proposal.

The testimony confirmed the December 3 Letter was intended as a walk-away resolution of the parties' situation given the dire financial circumstances facing GenCanna. The cessation of construction at the Mayfield Facility and lien problems were exacerbated by the destruction of GenCanna's only operating processing facility in early November. Any manufacturer would feel insecure on these facts and look for a solution.

The settlement offer did not refer to termination of the Agreement or the obligations thereunder. Broadbent, the recipient of the December 3 Letter, did not testify that he viewed it as an anticipatory repudiation of the Agreement by LDC. He took no action on the letter because it simply was not one of GenCanna's more pressing problems in November and December 2019.

Further, there is no evidence that LDC took any steps to sell or otherwise dispose of the unfinished dryer and cooler (or its components) after sending the December 3 Letter. This information could have evidenced repudiation, but the absence supports the conclusion that LDC only intended to propose a resolution. The December 3 Letter, like the October 16 Email, had no legal effect on the parties' relationship; it was an offer of settlement by LDC that GenCanna did not accept.

### C. The LDC proof of claim is not allowed.

LDC filed a proof of claim for $645,031 in GenCanna's bankruptcy case on June 20, 2020, offering "Breach of Contract" as the basis for the claim [Case No. 20-50133, Claim No. 10082]. "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f). Under the Bankruptcy Code, "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects." 11 U.S.C. § 502(a). GenCanna filed its Complaint, *inter alia*, objecting to and seeking disallowance of LDC's proof of claim on September 17, 2020. *See* FED. R. BANKR. P. 3007(b).

The prior discussion confirmed the final progress payment was not yet due. Further, LDC conceded in closing arguments that a fair result based on common sense precluded a judgment for GenCanna and allowance of the LDC claim. This concession was reasonable because, even assuming GenCanna breached the Agreement and Proposals by rejecting them in bankruptcy, LDC made no effort at trial to establish its damages in accordance with the Uniform Commercial Code. *See* KY. REV. STAT. § 355.2-708. Instead, LDC relied on arithmetic to establish the $645,831 claim for the balance due on the Agreement.

Therefore, the LDC claim is disallowed.

### IV. Conclusion

The foregoing constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. In reaching these findings and conclusions, consideration was given to all the parties' stipulations, evidence, and the arguments of counsel, regardless of whether they are referred to specifically herein. A separate Judgment consistent herewith shall be entered.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
Dated: Thursday, March 31, 2022
(grs)